J-S06039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                            :  PENNSYLVANIA
                                            :

               v.  :

KYRELL MORGAN  :

             Appellant  :  No. 337 WDA 2024

Appeal from the Judgment of Sentence Entered October 23, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0002678-2022

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:         **FILED: MARCH 18, 2025**

Appellant, Kyrell Morgan, appeals *nunc pro tunc* from the judgment of sentence imposed after a jury convicted him of third-degree murder, 18 Pa.C.S. § 2502(c), and endangering the welfare of a child (EWOC), 18 Pa.C.S. § 4304(a)(1).  On appeal, Appellant challenges the sufficiency of the evidence to sustain his murder conviction, as well as the legality of his sentence for EWOC.  After careful review, we conclude that the evidence was sufficient to support Appellant's murder conviction, but we agree with him that his sentence for EWOC is illegal.  Thus, we vacate his judgment of sentence and remand for further proceedings.

Appellant's convictions stem from the murder of his girlfriend's two-year-old daughter in December of 2021.  Following a jury trial in July of 2023, Appellant was convicted of the above-stated offenses.  On October 23, 2023, the court sentenced Appellant to 20 to 40 years' imprisonment for his third-

degree murder conviction, and a consecutive term of 20 to 40 months' incarceration, plus one-year probation, for his EWOC offense. Appellant filed a timely, post-sentence motion, which the trial court denied. He did not file a timely notice of appeal, but later sought the reinstatement of his appellate rights via a petition under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546. The court granted that petition on February 23, 2024, and Appellant filed a *nunc pro tunc* notice of appeal on March 22, 2024. He and the court thereafter complied with Pa.R.A.P. 1925.

Herein, Appellant states three issues for our review, which we reorder for ease of disposition:

> I. Whether the evidence was insufficient to convict [Appellant] of [t]hird-[d]egree [m]urder, where the Commonwealth failed to prove, beyond a reasonable doubt, that he inflicted the fatal injuries?
>
> II. Whether the evidence was insufficient to convict [Appellant] of [t]hird-[d]egree [m]urder, where the Commonwealth failed to prove, beyond a reasonable doubt, that [Appellant] possessed the requisite *mens rea*, namely, malice?
>
> III. Whether [Appellant's] sentence for [EWOC] is illegal when the conviction was graded as a second-degree felony despite the fact that the jury was never instructed nor made a finding of a "course of conduct" or "substantial risk of death or serious bodily injury," which is required for a second-degree felony grading?

Appellant's Brief at 5.

Appellant's first two issues challenge the sufficiency of the evidence to sustain his third-degree murder conviction. Initially, we observe that,

> "[w]hether the evidence was sufficient to sustain the charge presents a question of law." ***Commonwealth v. Toritto***, 67 A.3d 29 (Pa. Super. 2013) (*en banc*). Our standard of review is *de*

- 2 -

*novo*, and our scope of review is plenary. ***Commonwealth v. Walls***, 144 A.3d 926 (Pa. Super. 2016). In conducting our inquiry, we examine[,]

> whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, [is] sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence. For purposes of our review under these principles, we must review the entire record and consider all of the evidence introduced.

***Commonwealth v. Trinidad***, 96 A.3d 1031, 1038 (Pa. Super. 2014) (quotation omitted).

***Commonwealth v. Rojas-Rolon***, 256 A.3d 432, 436 (Pa. Super. 2021), *appeal denied*, 285 A.3d 879 (Pa. 2022).

Instantly, we first address Appellant's claim that the evidence failed to prove that he was the perpetrator of the murder. Before delving into the specifics of his argument, we reproduce the court's summary of the evidence presented at trial:

> [J.S.], mother of [the victim, B.S.], testified that she had been in a relationship with Appellant, and he moved in with her in September of 2021, when [B.S.] was two years old. In November of 2021, [J.S.] saw bruises on her child and suspected someone at the day care was abusing her child.[2] [J.S.] took [B.S.] out of the day care and went to Allegheny General Hospital ("AGH") for an evaluation.[3] [J.S.] was supposed to transport [B.S.] to [CHP] for further evaluation but instead took the child home.[4]

[2] Josh Lindblom, the CYF child abuse investigator assigned to assess the allegation of child abuse at the day care, testified that the Childline was unfounded due to the lack of evidence in support of this allegation. Shatia Harris, a worker at the day care, testified that [B.S.] arrived at the day care on [November 15, 2021,] her last day at the day care, with a bruise on her left side and the child would not say how it happened.

[3] Dr. Tyler McCardell, the emergency room physician at [AGH] who treated the child, testified that he observed bruises on both legs, arms, buttocks and trunk. He referred the child to Children's Hospital of Pittsburgh [("CHP")] for a non-accidental trauma evaluation because [J.S.] could not explain the child's injuries.

[4] [J.S.] later pled guilty to charges related to her failure to transport [B.S.] to CHP.

Turning to the incident which led to [B.S.'s] death, [J.S.] testified that on December 28, 2021, she gave [B.S.] a bath and did not observe any injuries or bruises on her daughter. The next day, [B.S.] woke up early at 4:00 a.m., but was happy and "normal," per [J.S.] [J.S.] left her residence at 5:45 a.m. to go to work, leaving Appellant as the only adult in the home. At 11:16 a.m., she received the first text from Appellant that [B.S.] [was] not feeling well. [J.S.] walked home at 2:00 p.m., encountered Appellant on his way to work, and arrived at her residence between 2:15 p.m. and 2:30 p.m. [J.S.] and Appellant worked opposite shifts and would frequently text each other, except on this night, December 29, 2021, Appellant did not text her at all. When [J.S.] returned to her residence, [B.S.] was lethargic and [lying] on her mother's bed. Eventually, she called 911 because [B.S.'s] body was limp, and she was not getting better. Paramedics came to the residence and worked on [B.S.] [J.S.] testified that when [B.S.'s] stomach was exposed by the paramedics, she saw a new bruise on [B.S.'s] stomach that looked like a hand. [J.S.] emphasized that Appellant was the only adult to watch [B.S.] on December 29, 2021.

Detective Greg Renko from the Allegheny County Police Department, Homicide [U]nit[,] testified that he interviewed Appellant twice. Appellant confirmed that [J.S.] worked the 6:00 a.m. [to] 2:00 p.m. shift, and that Appellant worked the 2:00 p.m.

[to] 10:00 p.m. shift. Appellant confirmed that he had sole custody of [B.S.] when [J.S.] was working.

Detective Michael Hoffman, at the time of the incident an Allegheny County Homicide [D]etective, testified that he was the officer responsible for the downloads of Appellant's phone. He stated that the extraction reports contained 66 pages of texts between [J.S.] and Appellant. Of note, on [November 15, 2021,] at 7:45 a.m., Appellant texted[,] "[B.S.] got this bruise." [J.S.] responded that she didn't see a bruise last night at bath time. Later, Appellant texted, "she keep [*sic*] saying I gave her them boo-boos, or I squish her."

Detective Hoffman also testified that on [December 29, 2021,] at 11:19 a.m., Appellant texted that [B.S.] had thrown up and it looked like diarrhea. [J.S.], in a subsequent exchange of texts, implie[d] that Appellant [was] cheating on her, and Appellant respond[ed] that he [was] going to stay with his cousin for a while. On [December 30, 2021], Appellant texted, "they fucked our relationship up." He also texted "I'm sorry [J.S.]" and "I just felt alone as fuck." Detective Hoffman also testified that Appellant's internet search history indicated that he entered [the] search terms[,] "2 year old Stow Twp. girl dies, police investigating[,]" approximately 12 times from 9:04 a.m. to 4:00 p.m. on [December 30, 2021,] and continued to frequently search on [December 31, 2021]. Additionally, Appellant searched, "what comes out in an autopsy[,]" on [December 31, 2021].

Trial Court Opinion (TCO), 7/10/23, at 6-8.

Additionally, the trial court explained that,

[a]t trial, Dr. Karl Williams, the Chief Medical Examiner of Allegheny County, testified that he conducted an autopsy of [B.S.] … on December 30, 2021. Dr. Williams determined the cause of death "was the result of trauma to the body resulting in bleeding inside the body." He further stated that the manner was homicide. Dr. Williams observed a "U shaped" pattern of bruising that he had not seen before in autopsies of other individuals. He stated that the child's bruising extended over both sides of the abdomen. He noticed other bruises on the child's shoulder and damage to the oral cavity, which were evidence of a recent physical injury. The bruising had occurred within a time frame of hours to days. In addition, the child had old and new injuries to her upper lip.

Dr. Williams additionally testified that he observed a tear in the liver indicative of blunt force trauma. He observed bruises on her left arm and on her right leg that were more evidence of trauma and would have required blunt force to have been applied. In fact, the child was covered in bruises from her lips to her knees. He observed no bruising to the child's back. He observed another laceration in the heart, which was caused by blunt force trauma. Further examination revealed blunt force trauma to the head and to the extremities. The lacerations to the child's heart and to her liver led her to slowly bleed to death. Dr. Williams opined that it would have taken several hours for the child to bleed to death. He testified that the injuries could have been caused by an adult squeezing the child from behind. He stated that the child had rib fractures evident in the skeletal survey. He said that the injuries he observed were consistent with a timeframe of showing symptoms at 11:00 a.m. and signs of breathing loss [the next morning] at 3:40 a.m. Dr. Williams concluded his testimony by reiterating that homicide was the only way that this child could have died.

Subsequently, Dr. Adelaide Eichman, from the [CHP] Division of Child Advocacy, testified that she reviewed [B.S.'s] medical records of her [December 30, 2021] visit to CHP and records of a prior visit to the hospital. She also conducted a skeletal survey which revealed two recently broken ribs and three other ribs which were possibly broken. Dr. Eichman testified that the internal injuries were caused by an "extreme amount of force." Symptoms such as sleepiness, vomiting, and diarrhea would occur within minutes to hours of the action causing the injuries. She stated that no play with an adult or child could have caused these injuries. It was her opinion that these injuries were inflicted due to physical abuse.

*Id.* at 4-6.

Appellant argues that the trial evidence was insufficient to prove that he was the person who caused B.S.'s death. Appellant notes that two other children were also in the house at the time B.S. was fatally injured, and he claims that "[p]erhaps the children were rough housing and accidentally squeezed B.S. too hard[,] causing the injury and the initial symptoms."

Appellant's Brief at 36-37. Appellant also stresses that J.S. was alone with B.S. during the window of time in which her fatal injury was inflicted. According to Appellant, not only did J.S. have the opportunity to harm B.S., but she also "had a history of physically hitting [the] children." *Id.* at 34. In support, Appellant relies primarily on his own testimony that he saw J.S. hit her children, including B.S., as well as J.S.'s admission that she spanked her son and had hit him "on the butt" with a belt. *See id.* (citing N.T. Trial, 7/18/23-7/19/23, at 565-66 (Appellant's testifying that J.S. hit her son with a belt); *id.* at 569-78 (Appellant's testifying that J.S. hit B.S. multiple times, and that she would only strike B.S. on her body, not her face); *id.* at 442-43 (J.S.'s testifying that she spanked her son and hit him with a belt on his butt)). Appellant contends that this evidence proves that on the day B.S. was fatally injured, J.S. had "the means and opportunity to hurt B.S." Appellant's Brief at 35.

Appellant also argues that, in contrast to J.S., he "never physically disciplined the children" and "did not have the temperament" to hurt B.S. *Id.* While Appellant admits that "B.S. started vomiting, having diarrhea, and was lethargic when [he] was the sole adult in charge[,]" he insists that "it is possible to have multiple conditions at the same time, even if one condition caused death." *Id.* at 36. Appellant further avers that "[t]here was no evidence that the symptoms [Appellant] noticed were caused by the injury to B.S. as opposed to an independent condition. Therefore, the symptoms are not dispositive of the injury occurring while [Appellant] was the sole adult in

charge." *Id.* Finally, Appellant insists that his internet search for information on B.S.'s death was not incriminating, and he only searched for "what all comes out in an autopsy" because "he had never heard that word before and he wanted to discover what it meant." *Id.* Thus, Appellant claims that the Commonwealth's evidence failed to prove, beyond a reasonable doubt, that he was the person who fatally injured B.S.

Appellant's arguments are unconvincing. Instead, we agree with the trial court that,

> [c]onsidering the evidence in the light most favorable to the Commonwealth, the jury could have reasonably concluded that Appellant was the only adult present when the child sustained her fatal injuries. He showed remorse in subsequent texts to [J.S.] He feverishly searched the internet for news relating to [B.S.'s] death and police investigation. Lastly, [B.S.] said that Appellant had "squished" her in November, and the child's injuries were consistent [with] Appellant "squishing" her to death.

TCO at 8.

We also reiterate that Dr. Eichman testified "no play with a child by an adult or another child could cause the[] types of injuries" sustained by B.S. N.T. Trial at 389. Thus, this testimony belies Appellant's claim that another child in the home might have injured B.S. while 'rough housing.'

Moreover, although J.S. was also alone with B.S., she explicitly denied having done anything to the child, even accidentally, that could have caused her injuries. *Id.* at 429-30. The jury was free to believe J.S.'s testimony. *See Trinidad*, 96 A.3d at 1038 (stating "the fact-finder is free to believe all, part or none of the evidence"). To the extent Appellant argues that the jury

- 8 -

should have disbelieved J.S., given her alleged history of hitting her children, that argument goes to the weight of the evidence, not its sufficiency. *See* ***Commonwealth v. Gaskins***, 692 A.2d 224, 227 (Pa. Super. 1997) (stating that "credibility determinations are made by the fact finder and that challenges thereto go to the weight, and not the sufficiency, of the evidence"). Accordingly, Appellant's first claim that the evidence was insufficient to prove that he was the person who fatally hurt B.S. is meritless.

Next, Appellant argues that the Commonwealth failed to prove he acted with malice in injuring B.S. Appellant claims that malice was not demonstrated because "the injury to B.S. was caused by a simple instance of squeezing," and "[t]here was no evidence that B.S.'s injuries were caused by a prolonged beating." Appellant's Brief at 32. He insists that the single injury to B.S., combined with the facts that he had no history of abusing B.S., he cared for her when she started exhibiting symptoms, and he was "significantly distressed" when paramedics arrived, demonstrates that he did not act with malice in harming B.S. *Id.* at 31.

Appellant relies on several cases to support his argument. First, he cites ***Commonwealth v. Hoffman***, 198 A.3d 1112 (Pa. Super. 2018). There, the evidence indicated that Hoffman had taken medication and fallen asleep on a couch, after which she rolled off the couch and onto an infant sleeping on the floor, thereby suffocating the baby. *Id.* at 1116. Hoffman did not call 911 for several hours after the infant's death. *Id.* at 1117. We concluded that these facts failed to establish the malice necessary for a third-degree murder

conviction, as there was no "evidence that, by taking the medication, Hoffman consciously disregarded an extremely high risk that her actions would result" in the victim's death. *Id.* at 1119. Additionally, Hoffman's delay in seeking help did not establish malice, as there was no evidence proving exactly when Hoffman had first noticed the baby had stopped breathing. *Id.* at 1120.

Second, Appellant relies on **Commonwealth v. MacArthur**, 629 A.2d 166 (Pa. Super. 1993), where during an argument, MacArthur pushed the decedent, who "lost his balance, somersaulted backwards over a railing, fell down five steps[,] and landed on the back of his neck." *Id.* at 168. The decedent later died at the hospital, and MacArthur was convicted of third-degree murder. *Id.* On appeal, we reversed, concluding that malice had not been shown where "the injury was the tragic but improbable result of a single push." *Id.* at 169.

Third, Appellant cites **Commonwealth v. McFadden**, 292 A.2d 324 (Pa. 1972). In that case, McFadden intended to spank the 3-year-old victim who was jumping on the bed, but "as he reached out…, he caught the child in flight and, while intending to strike him on the backside, he actually struck him in the abdomen." *Id.* at 325. The child seemed fine and went to bed, but was found dead in the morning. *Id.* at 325-26. Our Supreme Court overturned McFadden's conviction for third-degree murder, stressing that McFadden had "hit the child one time in an attempt to punish him[,]" *id.* at 327, and the evidence "demonstrated that McFadden treated the child as his own, loved[,] and cared for him." *Id.* at 326. The Court held that this

evidence could not support a finding that McFadden acted with malice. *Id.* at 327.

In the instant case, Appellant claims that "[l]ike *MacArthur* and *McFadden*, B.S. may have been injured by one blow." Appellant's Brief at 32. He also claims that, as in *McFadden*, "the injury to B.S. was caused by a simple instance of squeezing, [Appellant] cared for B.S., and [Appellant] did not have any history of abuse…." *Id.* Appellant further contends that, "[l]ike *Hoffman*, there was no evidence of how long [Appellant] knew [B.S.'s] injury was serious before he called 911." *Id.* at 33. Thus, Appellant argues that "the Commonwealth failed to prove malice beyond a reasonable doubt and the conviction for [t]hird-[d]egree [m]urder must be vacated." *Id.*

In rejecting this claim, the trial court concluded that, "[t]hrough the testimony of [Drs. Williams and Eichman], the Commonwealth established the element of malice." TCO at 5. It explained:

> To convict an accused of third[-]degree murder, the Commonwealth must prove that the accused killed another person with malice. *Commonwealth v. Santos*, … 876 A.2d 360, 363 ([Pa.] 2005). Malice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty. *Id.*

> *Commonwealth v. Hardy*, 918 A.2d 766, 774 (Pa. Super. 2007). Under similar circumstances, courts have upheld the finding of malice.

> It was reasonable for the jury to conclude that grabbing [the v]ictim, an infant, with enough violence to fracture ribs, shaking him and/or otherwise causing his head to strike an object[,] constituted not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness

- 11 -

of consequences, and a mind regardless of social duty—*i.e.*, malice necessary to support [the a]ppellant's murder conviction. *See Commonwealth v. Shaffer*, 722 A.2d 195, 199 (Pa. Super. 1998) (holding evidence sufficient to establish malice where record showed infant died of blunt force trauma to the head and had sustained fractured skull, brain injuries, eight fractured ribs, and several abrasions and bruises on numerous parts of his body). We hold that there was sufficient evidence to find malice.

[*Hardy*, 918 A.2d] at 774-75. Likewise, the finding of malice was supported by competent evidence in the matter *sub judice*, and the jury's finding should not be disturbed.

*Id.* at 4-6 (citations to the record omitted).

We agree with the trial court's conclusion that malice was proven based on the evidence presented at trial, namely the testimony of Drs. Williams and Eichman regarding the severity and number of injuries sustained by B.S. We also conclude, based on the testimony of the doctors, that the cases cited by Appellant are distinguishable from the instant facts. As the Commonwealth aptly explains:

Here, unlike *Hoffman*, *MacArthur*, and *McFadden*, the medical testimony showed the victim's death was not accidental. Dr. Eichman ruled out the possibility that these injuries were caused by routine care of the child, an adult playing with the child, or the children playing with each other. Dr. Eichman testified in no uncertain terms that these injuries were from an extreme amount of force: "If you saw someone interacting with a child in this manner, you would know instinctively this was wrong, and the child was being harmed by the amount of force directed at the child." Dr. Eichman concluded that these injuries were inflicted, not accidental, and were the result of child abuse.

Moreover, even if the testimony established B.S.'s injuries were caused by a single squeeze, which it does not,[6] the law does not automatically preclude a finding of malice. *Commonwealth v. Frye*, 319 A.3d 602, 608 (Pa. Super. 2024). "[W]hether an assault by fists alone demonstrates malice for purposes of third-

- 12 -

degree murder, depends on the particular circumstances of the case." *Id.* (internal quotations omitted). Those circumstances include: "the size of the assailant, the manner in which the fists are used, the ferocity of the attack and its duration, and the provocation are all relevant to the question of malice." *Id.* at 607.

> [6] Dr. Williams opined that B.S.'s injuries could have been caused by adult hands squeezing the sides of her abdomen from behind, and that her injuries were consistent with compression of the chest. Dr. Eichman testified that an extreme amount of force would have been required to cause these injuries. However, there was no testimony establishing the exact number of times B.S. may have been squeezed.

> Appellant was a nineteen-year-old adult; B.S. was a twenty to twenty-five pound two-year-old child. Appellant did not seek medical care for B.S. when she began exhibiting symptoms. Instead, Appellant made his six-year-old sister give B.S. a bath after B.S. vomited and defecated herself. [N.T. Trial] at 312-14, 316-17, 595-96, 739. Appellant also directed his sister to make lunch for B.S.…. *Id.* at 316-17, 739. Appellant played video games and was on his phone "a lot" while B.S. was sick. *Id.* at 316-17, 592-93. Appellant also left the house twice, leaving the children unattended, to go to his cousin's house and smoke marijuana. *Id.* at 315, 341, 747.

> The severity of B.S.'s injuries and Appellant's failure to seek medical care for B.S.'s injuries while she was in his sole custody demonstrates malice. The jury did not err in concluding that a fully grown adult who used excessive force upon a two-year-old child evidenced an extreme indifference to the value of human life. Thus, the Commonwealth proved beyond a reasonable doubt that Appellant possessed the requisite *mens rea* with respect to his third-degree murder conviction.

Commonwealth's Brief at 15-17.

We agree. The Commonwealth's argument, the trial court's opinion, the legal authority cited by Appellant, and our review of the evidence presented at trial, convince us that this case is distinguishable from **Hoffman**, **MacArthur**, and **McFadden**. Here, the Commonwealth proved, beyond a

reasonable doubt, that Appellant acted with malice in fatally injuring B.S. Accordingly, his conviction for third-degree murder must stand.

Lastly, Appellant contends that the felony grading of his EWOC conviction is illegal, as the jury did not make the requisite factual findings necessary to sustain that grading. Initially, we note that

> a claim that the court improperly graded an offense for sentencing purposes implicates the legality of a sentence. A challenge to the legality of sentence is never waived and may be the subject of inquiry by the appellate court *sua sponte*. … Our standard of review is *de novo*, and the scope of our review is plenary.

*Hoffman*, 198 A.3d at 1123 (cleaned up).

The grading component of the EWOC statute states the following:

**(b) Grading.--**

(1) Except as provided under paragraph (2), the following apply:

(i) An offense under this section constitutes a misdemeanor of the first degree.

(ii) If the actor engaged in a course of conduct of endangering the welfare of a child, the offense constitutes a felony of the third degree.

(iii) If, in the commission of the offense under subsection (a)(1), the actor created a substantial risk of death or serious bodily injury, the offense constitutes a felony of the third degree.

(iv) If the actor's conduct under subsection (a)(1) created a substantial risk of death or serious bodily injury and was part of a course of conduct, the offense constitutes a felony of the second degree.

(2) The grading of an offense under this section shall be increased one grade if, at the time of the commission of the offense, the child was under six years of age.

18 Pa.C.S. § 4304(b).

Thus, under this provision, EWOC is graded as a first-degree misdemeanor, unless there was a course of conduct, a substantial risk of death or serious bodily injury, and/or the victim was under the age of six. If any of these factors are present, the EWOC offense is graded as a felony. As the Commonwealth concedes, "for a defendant to be subject to felony grading of this offense the jury must be instructed on the additional factor(s) justifying the enhancement, the Commonwealth must allege the additional factor(s) in the criminal information, and the Commonwealth must present evidence of the additional factor(s) at trial." Commonwealth's Brief at 25-26 (citing **Commonwealth v. Popow**, 844 A.2d 13, 18 (Pa. Super. 2004)).

Both the trial court and the Commonwealth acknowledge that here, the jury was not instructed on the requisite facts necessary to grade Appellant's EWOC charge as a felony. **See id.** at 26 ("The criminal information in this case alleged that the victim was under six and Appellant created a substantial risk of death or serious bodily injury. However, the jury was not specifically instructed to find these facts with respect to Appellant's EWOC charge."); TCO at 8 ("While the criminal information allege[d that Appellant] created a substantial risk of death or serious bodily injury, the jury was not instructed on this element, and it cannot be assumed that the jury made any such finding."). Our review of the record confirms that the necessary jury instruction was not provided.

Thus, we agree with the parties and the court that Appellant's judgment of sentence for EWOC must be vacated, and the court must resentence him for that offense, graded as a first-degree misdemeanor. Because our disposition upsets the court's overall sentencing scheme, we vacate Appellant's judgment of sentence in its entirety and remand for resentencing.

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/18/2025